```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF RHODE ISLAND

_____
                                   )
UNITED STATES OF AMERICA           )
                                   )
                                   )
     v.                            )    Cr. No. 21-00077-WES
                                   )
DAVID A. SKALLY,                   )
                                   )
               Defendant.          )
_____)
```

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, District Judge.

Defendant David A. Skally is charged with a second violation of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2) for possessing and accessing with intent to view child pornography. Indictment 1, ECF No. 1; Def.'s Mot. Suppress 1, ECF No. 36. Skally now moves to suppress the following: statements made during a polygraph examination (which was administered pursuant to the supervised release conditions related to his first offense), images obtained via monitoring software on his computer (another condition of the sentence for his previous offense), statements made during a subsequent home visit, and images obtained following a search and seizure of his computer. After careful consideration, the Motion to Suppress, ECF No. 36, is DENIED.

I.  Background[1]

The statements that Skally seeks to suppress relate to his supervised release following his 2017 conviction of possession and access with intent to view child pornography. In addition to his carceral sentence, Skally was sentenced to a term of supervised release and was subject to several conditions, including that he "truthfully answer the questions asked by [his] probation officer," as well as the following pertinent special conditions:

> 2. The defendant shall participate in a sex offender specific treatment program as directed by the probation officer.
> 3. The defendant shall participate in testing in the form of polygraphs or any other methodology approved by the Court in order to measure compliance with the conditions of supervision or treatment.
>
>     * * *
>
> 5.  The defendant shall permit the probation officer, who may be accompanied by either local, state, or federal law enforcement authorities, upon reasonable suspicion of a violation of supervision, to conduct a search of the defendant's residence, automobile, workplace, computer, and other electronic communication or data storage devices or media.
> 6. The defendant shall notify the probation officer of all computers and other electronic communication or data storage devices or media owned or operated by the defendant at the commencement of supervision, and immediately report any additional software purchases, acquisitions, or use during the term of supervision.
> 7. The defendant must submit to unannounced examination of his computer or other electronic equipment by the probation officer, who may be accompanied by either

---

[1] Facts pertaining to the polygraph examinations are largely drawn from the polygraph examiner's reports as the recordings of the polygraph examinations are not available. See Mot. Suppress Tr. 8:6-8, ECF No. 41.

2

> local, state, or federal law enforcement authorities, which may include retrieval and copying of all data from the computer to ensure compliance with this condition. In addition, the defendant must consent to the removal of such equipment for the purpose of conducting a more thorough investigation and must allow, at the discretion of the probation officer, installation on the defendant's computer of any hardware or software system to monitor his computer use.

1:16-cr-0098-WES, ECF No. 34. After his release, Skally submitted to three polygraph examinations, each at the request of his therapist and probation officer. Gov.'s Resp. Ex. C at 1, ECF No. 38-3; Gov.'s Resp. Ex. D at 1, ECF No. 38-4; Gov.'s Resp. Ex. E at 1, ECF No. 38-5; Def.'s Mem. Supp. Mot. Suppress ("Def.'s Mem.") 3-4, ECF No. 36-1. As part of each examination, Skally signed and initialed a "statement of consent and release" that included the following provisions:

> I have been informed that I do not have to take this examination; that all examination questions will be reviewed and I can stop this examination at any time. ____ (initials)
> I further understand any deliberate misrepresentation or withholding of information from the polygraph examiner will result in failure of this examination. ____ (initials)
> I [have] been informed that I do not have to answer any questions or give any information; and understand that any information I volunteer and the report generated thereafter will only be made available to my therapist _____ and probation officer _____, regardless of any current or future releases on my part. ____ (initials)
> Fifth Amendment issues to be added here

See, e.g., Gov.'s Resp. Ex. C at 9. Skally understood that there would be consequences if he decided not to participate in the polygraph, but "no such consequences were clearly defined or

3

discussed." Gov.'s Resp. 3, ECF No. 38. Nor were the consequences of failing a polygraph conveyed. See id.

Each examination began with a pre-test (where the examiner explained the process), followed by the polygraph itself, and ended with a post-test (where the examiner reviewed the responses with Skally). See, e.g., Gov.'s Ex. B at 1-2. The first exam, "a Full Disclosure Sexual History Polygraph Examination" to be used "in conjunction with supervision and treatment under the direction of Skally's therapists," took place on June 5, 2020, and the examiner placed Skally's responses in the "deceptive" range. Gov.'s Resp. Ex. C.

The second, conducted on December 21, 2020, was a maintenance exam "to determine violations/compliance with probation mandates." Gov.'s Resp. Ex. D 1. During the pre-test, Skally expressed suspicion with the polygraph and told the examiner "I told the truth last time and the machine failed me." Id. at 2. During the polygraph portion of the exam, he denied viewing illicit images of anyone he knew to be under the age of eighteen but showed "significant responses" when doing so. Id. at 3, 5. In the post-test, Skally explained that he could "only trust what the websites say." Id. at 5. The examiner again placed Skally's responses in the "deceptive" range. Id.

The third polygraph, characterized as a "Maintenance Examination Re-Test to determine violations/compliance with

4

probation mandates," was conducted on April 5, 2021. Gov.'s Ex. E 1, ECF No. 38-5. During the pre-test, Skally again expressed suspicion with the polygraph, telling the examiner: "I told the truth last time . . . [t]he polygraph was wrong." Id. at 2. At that point, the examiner explained the importance of telling the truth when answering and said, according to his report, "[t]o pass a polygraph one must be 100% honest and disclose any information that is on one's mind when developing the questions so that the questions can be developed fairly and accurately. Disclosing any issues related to the question allows the examinee to respond with complete honest[]y." Id. Skally then told the examiner that he had not been fully honest during the December 21 examination with respect to his internet activities and that he had visited pornography sites on a computer that probation did not monitor and viewed illicit images of minors—he explained that he was "pretty sure" none of the images were of children under the age of thirteen. Id. at 3-4.

During the polygraph test itself, when asked "since being released, did you masturbate to sexual images of people you knew to be under age 11?" Skally replied no but "showed significant responses." Id. at 5. The test was again rated as "deceptive." Id. Skally's probation officer joined by phone for the post-test interview. Id. at 6. Skally then admitted to viewing illicit images of children he knew to be younger than eleven years old.

5

Id.  Skally seeks to suppress these April 5 admissions.

On April 14, 2021, probation officers visited Skally's home. Gov.'s Resp. Ex. B at 2, ECF No. 38-2.  During the visit, Skally told the officers that he had not viewed any pornography since late January 2021.  Id.  However, soon after, remote monitoring software revealed near daily viewing of pornography between April 21 and May 4, some of which appeared to be illicit.  Id.  Skally seeks to suppress the images unearthed via remote monitoring software.

On May 4, 2021, probation officers visited Skally's home again.  During the visit, Skally admitted to viewing illicit images of children online.  Id.  Probation officers then seized Skally's desktop computer.  Id.  Forensic examination of the computer unearthed seventeen images and two videos of child pornography. Gov.'s Resp. Ex. F at 6, ECF No. 38-7.  Skally seeks to suppress the statements he made on May 4 and the images and videos found on his computer.

II.  Discussion

    A. April 5 Statements

Skally argues that his April 5 statements must be suppressed as they were compelled in violation of the Fifth Amendment.

> The Fifth Amendment, in relevant part, provides that no person "shall be compelled in any criminal case to be a witness against himself."  It has long been held that this prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he

>is a defendant, but also "privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."

Minnesota v. Murphy, 465 U.S. 420, 426 (1984) (citation omitted). Further,

>[a] defendant does not lose this protection by reason of his conviction of a crime; notwithstanding that a defendant is imprisoned or on probation at the time he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted.

Id. Generally, a witness must invoke his Fifth Amendment right to seek its protection. Id. at 429. There are exceptions, however. Id. at 429-40. Particular to this case are the so-called penalty exception and the custodial interrogation exception. See id. at 430, 434.

Skally acknowledges that he did not invoke his Fifth Amendment right at any time during the polygraph examination and instead argues that the penalty and custodial interrogation exceptions to the general rule requiring invocation of the Fifth Amendment right apply.

### 1. Penalty Exception

The penalty exception applies if the government, "either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation," thus creating "the classic penalty situation, [in which] the failure to assert

7

the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." Id. at 435. When the penalty exception applies, the Fifth Amendment becomes self-executing. A classic example of a penalty situation is where a defendant is given the choice between invoking the Fifth Amendment and losing their job or providing self-incriminating statements. See Garrity v. New Jersey, 385 U.S. 493, 497 (1967).

In the seminal case of Minnesota v. Murphy, the defendant was required to meet with his probation officer and be truthful with the officer "in all matters." 465 U.S. at 422. During one such meeting, the probationer denied the charges upon which his probation was based but admitted committing an unrelated rape and murder. Id. at 423. The Court determined that the admission was not the product of a penalty situation because the conditions only required truthfulness and did not contain any suggestion that probation was conditioned on answering all questions and never invoking his Fifth Amendment right. Id. at 437. The Court clarified that, regardless of whether an objective or subjective test was used, "there [was] no reasonable basis for concluding that [the government] attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination." Id.

Similarly, requiring a probationer to participate in a polygraph exam does not violate the Fifth Amendment. See United

States v. York, 357 F.3d 14, 25 (1st Cir. 2004). This is especially true where the polygraph condition specifically explains that assertion of the Fifth Amendment does not constitute a violation of probation. See United States v. Rogers, 988 F.3d 106, 107 (1st Cir. 2021) (no Fifth Amendment violation where probation condition required polygraph examinations and provided that refusal to answer based on the Fifth Amendment would not be sole basis of a violation), cert. denied, 142 S. Ct. 268 (2021); United States v. Hood, 920 F.3d 87, 93 (1st Cir. 2019) (same); York, 357 F.3d at 18 (no Fifth Amendment violation where condition required polygraph and provided that "[w]hen submitting to a polygraph exam, the defendant does not give up his Fifth Amendment rights"). While the language of the condition here does not explicitly state that the defendant "does not give up his Fifth Amendment rights" as in York, there is no language that implicitly or explicitly suggests Skally would face a penalty if he invoked his Fifth Amendment right. See 357 F.3d at 18. Further, none of these cases suggests that the absence of an explicit statement referencing the Fifth Amendment is required.

Skally claims he faced a "cruel trilemma" wherein he could either invoke his Fifth Amendment right to stay silent (and run afoul of the conditions of his release), lie (and run afoul of the conditions of his release), or tell the truth (and, again, run afoul of the conditions of his release as well as open himself up

to additional criminal charges). There was no such "cruel trilemma."

First, the condition does not require Skally to answer every single question; it merely requires participation in the polygraph, which did not foreclose Skally's ability to invoke the Fifth Amendment. See id. at 25; see also Murphy, 465 U.S. at 435. Indeed, the form Skally signed before each polygraph explicitly stated that he was not required to answer every question. Remaining silent in response to a specific question would not violate any condition of Skally's supervised release.[2]

Second, lying during a polygraph would not actually violate the conditions of supervised release. The conditions only required truthfulness with respect to questions asked by the probation officer. The examination was not administered by his probation officer. Although Skally's probation officer was present during the May 5 post-test, he did not question Skally at

---

[2] Skally urges the Court to follow United States v. Saechao, 418 F.3d 1073 (9th Cir. 2005), where the Ninth Circuit held that the probationer, who provided self-incriminating statements during a routine meeting with his probation officer, was "'compelled' to incriminate himself under threat of probation revocation." Def.'s Mem. at 12 (quoting Saechao, 418 F.3d at 1075-76, 1081). There, the conditions of probation went beyond the truthfulness requirement found in Murphy and required that the probationer "promptly . . . answer all reasonable inquiries." Saechao, 418 F.3d at 1078. Because the probationer was required to answer questions, any invocation of the Fifth Amendment would violate the condition and create a penalty situation. Here, however, since no questions were posed by Skally's probation officer, the issue is distinct from Saechao.

10

that time.  In addition, the conditions do not provide, and Skally was never told, that failing a polygraph test would be a violation of the conditions.

And finally, a truthfulness condition combined with a polygraph condition does not create a penalty situation.  See Hood, 920 F.3d at 93 (no penalty situation where there was no separate truthfulness condition but defendant was required to answer polygraph questions truthfully); see also Murphy, 465 U.S. at 437.  Skally argues that the polygraph examiner's emphasis on the importance of truthfulness, combined with the requirement to participate, created an environment where he had to choose between silence (thereby violating a condition of probation) and self-incrimination.  Def.'s Mem. 17-18.  Although the polygraph examiner emphasized the importance of truthfulness, he did not tell Skally that questions must be answered.

Thus, although Skally had to make a choice, he was not faced with a "cruel trilemma."  He could invoke his Fifth Amendment right and refuse to answer, which would not violate the conditions of his supervised release; he could lie, which also would not violate the conditions of his supervised release; or he could tell the truth, which was the only option that likely would result in negative consequences.  Accordingly, the circumstances did not create a penalty situation.

### 2. Custodial Interrogation Exception

Skally also argues that the polygraph test amounted to a "custodial interrogation" and, therefore, Miranda warnings, which were not given, were required. Def.'s Mem. 20. "[I]t is a constitutional rule that a confession resulting from custodial interrogation not preceded by appropriate warnings is normally inadmissible against the speaker." United States v. Genao, 281 F.3d 305, 310 (1st Cir. 2002) (citing Dickerson v. United States, 530 U.S. 428, 431–32, 444 (2000)). The First Circuit recently considered whether a polygraph examination administered pursuant to probation conditions is a custodial interview requiring Miranda warnings and held that it was not. See Rogers, 988 F.3d at 113. Nothing here counsels a different result.

### B. May 4 Statements and Search and Seizure

Skally argues that the May 4 statements and the images obtained from the seizure of his computer should be suppressed because they are fruits of his April 5 statements, which he argues were obtained in violation of his Fourth Amendment rights. Def.'s Mot. 19.

This argument is dispensed with easily. Because the statements made on April 5 were not compelled, the subsequent statements and seizure are not fruits of a constitutional violation. Furthermore, even assuming Skally's April 5 admission was compelled, the May 4 admission and recovered images would be

12

admissible under both the inevitable discovery doctrine and the attenuation doctrine.

The inevitable discovery exception to the exclusionary rule applies where

> evidence that would inevitably have been discovered without reference to the police error or misconduct may be admitted at trial. Such evidence is admissible so long as (i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment.

United States v. Crespo-Rios, 645 F.3d 37, 42 (1st Cir. 2011) (citations and internal quotation marks omitted).

Here, the search and seizure occurred after the monitoring software, which was in place prior to the April 5 statements, revealed his visits to illicit websites. This provided a basis for the search and seizure independent from Skally's admission. Thus, even if Skally had said nothing during the polygraph examination, probation would have had information sufficient to justify the search and seizure. The Court is also confident that application of the exception in this case would not erode the efficacy of the exclusionary rule or promote police misconduct. See id. at 44.

Similarly, if Skally's April 5 statements contributed to the

reasons for the May 4 search and seizure,[3] the search and seizure is sufficiently distinguishable from the April 5 statements—due to the information uncovered by the monitoring software—such that the attenuation doctrine applies. See United States v. Gordon, 954 F.3d 315, 322 (1st Cir. 2020). Under this doctrine, "evidence may be admitted when later obtained 'by means sufficiently distinguishable' from the initial means." Id. (quoting Wong Sun v. United States, 371 U.S. 471, 487-88 (1963)). Applicability is based on the balancing of several factors: "(1) '[t]he voluntariness of the statement'; (2) '[t]he temporal proximity' of the earlier and later means; (3) 'the presence of intervening circumstances'; and (4) 'the purpose and flagrancy' of law enforcement's initial misconduct." Id. (quoting Brown v. Illinois, 422 U.S. 590, 603-04 (1975)).

The factors point away from suppressing the May 4 statements and seized images. This conclusion is especially bolstered by the presence of intervening circumstances: probation conducted the search following receipt of the results from the monitoring software. Furthermore, assuming there was misconduct, the purpose of the polygraph examination was to support Skally's treatment and to ensure that he did not commit additional crimes, and any

---

[3] It is unlikely that the April 5 statements played an essential role, however, given that probation visited Skally's home after the April 5 polygraph, on April 14, and did not conduct a search of his computer.

misconduct was likely unintentional, supporting a conclusion that the May 4 statements and seizure are sufficiently attenuated from the April 5 statements.

   C. Images Obtained through Monitoring Software and from Seized Computer

Finally, Skally seeks to suppress the images obtained with the monitoring software[4] and from his seized computer, arguing that they were obtained in violation of his Fourth Amendment rights. Def.'s Mot. at 23.

Although "the exclusionary rule does not bar the introduction at parole revocation hearings of evidence seized in violation of parolees' Fourth Amendment rights," Penn. Bd. of Probation & Parole v. Scott, 524 U.S. 357, 364 (1998), the rule does apply when the government seeks to present evidence discovered through a

---

[4] To the extent Skally attacks the condition's validity, any such attack is fruitless. Upon review, the Court is confident that the use of monitoring software in this case did not violate the Fourth Amendment. The monitoring software used in this case is valid because the underlying offense relied on child pornography Skally downloaded from the internet, see 1:16-cr-0098-WES, ECF No. 3, and Skally has a history of using the internet to access child pornography, see United States v. Windle, 35 F.4th 62, 67 (1st Cir. 2022) (upholding broad restrictions on internet access as a condition of supervised release "'where (1) the defendant used the internet in the underlying offense; (2) the defendant had a history of improperly using the internet to engage in illegal conduct; or (3) particular and identifiable characteristics of the defendant suggested that such a restriction was warranted.'" (citation omitted)); see also United States v. Aquino-Florenciani, 894 F.3d 4, 7 (1st Cir. 2018) (holding that "the use of the disjunctive 'or' indicates that meeting a single factor justifies the imposition of restrictions on internet access").

15

warrantless search during a subsequent criminal trial, see <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 872 (1987) (determining that warrantless search of probationer's home did not violate Fourth Amendment). Thus, a probationer's status as such does not obviate the Fourth Amendment's protections.

As the government points out, however, "[i]nherent in the very nature of probation is that probationers 'do not enjoy "the absolute liberty to which every citizen is entitled."' Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." <u>United States v. Knights</u>, 534 U.S. 112, 119 (2001) (quoting <u>Griffin</u>, 483 U.S. at 874).

Skally seeks to apply the test set forth in <u>Murphy</u> (which applies to the Fifth Amendment) to the Fourth Amendment, arguing that he was "compelled" to give up his Fourth Amendment rights as a condition of his supervised release and that, therefore, any evidence discovered pursuant to a condition of his supervised release cannot be used in these criminal proceedings. Def.'s Mot. at 25. Skally has not cited any authority for his argument, nor could the Court find any such authority.

Further, the conditions of Skally's release required that he submit to a warrantless search of his home and computer "upon reasonable suspicion of a violation of supervision." 1:16-cr-

16

0098-WES, ECF No. 34. Such a condition is constitutional. See Knights, 534 U.S. at 121 (holding that warrantless search of probationer's home pursuant to a condition allowing such a search was constitutional because there was reasonable suspicion). Skally argues that Knights is not applicable because the basis for the reasonable suspicion in Knights was a result of a violation of Knights' constitutional rights. Mot. Suppress Tr. 29:20-30:11. The argument fails. Probation had reasonable suspicion of a violation of the conditions of supervision to support the search of Skally's home and seizure of his computer: Skally admitted to viewing child pornography on his computer and the monitoring software exposed his visits to illicit websites, neither of which were obtained in violation of Skally's constitutional rights. Thus, seizure of the images found on Skally's computer did not violate his Fourth Amendment rights.

III. Conclusion

For the forgoing reasons, Defendant's Motion to Suppress, ECF No. 36, is DENIED.

IT IS SO ORDERED.



William E. Smith
District Judge
Date: November 8, 2022

17